**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>NICOLO NOURAFCHAN,<br>ROBERT YADGAROV,<br>MARK ALPERIN,<br>MIAKEL BISHAY,<br>DAVID BRATSLAVSKY,<br>BRIAN FENSTERSZAUB,<br>MARK FENSTERSZAUB,<br>SIMON FENSTERSZAUB,<br>GABRIEL GERSHOWITZ,<br>FERNANDO GRINBERG,<br>BORUCH HATANIAN,<br>YISROEL HOROWITZ,<br>JOSEPH IZSAK,<br>DANIEL KAVIAN,<br>ELIYAHU KAVIAN,<br>NOWEL MILIK,<br>LORENZO NOURAFCHAN,<br>DAVID OSTROV,<br>GAVRYEL SILVERSTEIN,<br>JOSEPH SUSKIND, and<br>SETH WINSLOW,<br><br>　　　　Defendants. | **Civil Action No. 26-cv-**<br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges

as follows against the defendants:

### SUMMARY OF THE ACTION

1. From in or about 2018 through in or about 2024 (the "Relevant Period"),

Defendants Nicolo Nourafchan ("Nourafchan") and Robert Yadgarov ("Yadgarov") orchestrated

an insider trading scheme that netted the participants millions of dollars in illicit profits from

trading in the securities of U.S. companies. The scheme (the "Tipping Scheme") involved

insider trading tips originating from lawyers, including Nourafchan himself.  Nourafchan is an attorney who worked on mergers and acquisitions at various global law firms at times relevant to the Complaint.

2.    Nourafchan carried out the Tipping Scheme by misappropriating material nonpublic information about approximately a dozen impending corporate transactions (such as mergers, acquisitions, and a tender offer) (the "Deals") from his law firm employers and tipping that information with Yadgarov and others to the co-Defendants.

3.    Beginning in late 2018 and continuing in 2019, Nourafchan and Yadgarov also recruited into the Tipping Scheme Gabriel Gershowitz ("Gershowitz"), who attended college with Nourafchan and Yadgarov, and who, like Nourafchan, worked as a corporate lawyer at two global law firms at times relevant to this Complaint.  In or about April 2019, Gershowitz began tipping Nourafchan and Yadgarov with material nonpublic information obtained from his law firm employers.

4.    Nourafchan and/or Yadgarov tipped the confidential information to individuals who agreed to kick back a portion of the trading profits to Nourafchan and/or Yadgarov in exchange for such information.  These individuals included Defendant David Bratslavsky ("Bratslavsky"), who attended college with Nourafchan; Defendant Lorenzo Nourafchan ("L. Nourafchan"), the brother of Nourafchan; and a Russian national referred to herein[1] as "Foreign Trader 1."

5.    Between 2020 and 2022, Nourafchan and/or Yadgarov tipped Bratslavsky, who used the tips to trade in his own account and also provided the tips to a third party to place trades on Bratslavsky's behalf.  Nourafchan, Yadgarov, and Bratslavsky agreed that Bratslavsky would

---

[1] Foreign Trader 1 lives outside of the United States and is not identified by name here, as he is not a defendant.

share a percentage of the trading profits with Nourafchan and Yadgarov.  Bratslavsky met with Nourafchan and/or Yadgarov in person at least twice and paid them thousands of dollars for the illicit tips that yielded substantial trading profits.

6.      By at least July 2022, Nourafchan also began tipping his brother, L. Nourafchan, who began tipping his hair stylist, Miakel Bishay ("Bishay"), in advance of at least two Deals, and Bishay agreed to pay L. Nourafchan a kickback equal to a percentage of the trading profits generated by those Bishay recruited.  L. Nourafchan indicated to Bishay that L. Nourafchan could not trade, and told Bishay not to trade on the information so L. Nourafchan would not be caught (a directive that Bishay disregarded).  Bishay communicated certain confidential information conveyed by L. Nourafchan to Bishay's friend Nowel Milik ("Milik"), who paid Bishay for the information, and both Milik and Bishay traded on the confidential information tipped by L. Nourafchan.

7.      During the Relevant Period, Nourafchan and/or Yadgarov also tipped Defendant Gavryel Silverstein ("Silverstein"), who did not trade on the information himself, but instead acted as a middleman, recruiting several co-defendants to trade on the tips that Silverstein obtained from Nourafchan and/or Yadgarov and collecting a portion of the trading profits from the illegal trading scheme on behalf of himself, Nourafchan, and Yadgarov.  Silverstein's recruits, in turn, recruited additional traders, most of whom resided in New York or Florida, who also traded on the inside information Silverstein provided and who kicked back a portion of their illicit profits up the tipping chain, with a significant portion ultimately reaching Nourafchan and Yadgarov.

8.      Below is a chart summarizing the relationships among the Defendants as well as the paths through which the material nonpublic information was typically routed by Nourafchan and/or Yadgarov to the other Defendants:

3



9.    Nourafchan and Yadgarov, their co-defendants, and Foreign Trader 1 collectively generated millions of dollars in illicit profits trading the securities of numerous U.S. companies, both through their individual trading accounts and through accounts held in the names of others.

10.    Each of the Defendants tipped others with material nonpublic information for a benefit and/or placed trades while aware of and on the basis of material nonpublic information obtained, directly or indirectly, from sources who they knew or recklessly disregarded had breached a duty to maintain the confidentiality of such information.

11.    In tipping his co-defendants and Foreign Trader 1, Nourafchan breached the

internal policies of the law firms for which he worked, all of which dictated that information related to corporate transactions must be kept confidential. Nourafchan provided the inside information to Yadgarov and other Defendants for a benefit and with the knowledge that they would use it to trade securities and/or unlawfully communicate the information to others who would place the trades. Similarly, Gershowitz disregarded the internal policies of his law firms, which required him to keep information related to corporate transactions confidential. Gershowitz provided the information to Nourafchan and Yadgarov for a benefit and with the knowledge that they would use it in furtherance of the Tipping Scheme.

12. Nourafchan and Yadgarov expected to, and in fact did, receive, directly or indirectly from their co-defendants and Foreign Trader 1,[2] payments and other benefits in exchange for the insider tips they provided.

13. By knowingly or recklessly engaging in the conduct described in this Complaint, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and, as to Nourafchan, Mark Fensterszaub, Simon Fensterszaub, Yisroel Horowitz ("Horowitz"), Silverstein, Mark Alperin ("Alperin"), Daniel Kavian, and Eliyahu ("Eli") Kavian, Exchange Act Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

14. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21A(a) [15 U.S.C. §§ 78u(d) and 78u-1(a)].

---

[2] Foreign Trader 1 lives outside of the United States and is not identified by name here, as he is not a defendant.

15.     The Commission seeks a final judgment: (a) permanently enjoining the Defendants from violating the federal securities laws this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; and (d) ordering any other and further relief the Court may deem just and proper,

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action under Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].  Certain of the acts, practices, transactions, and courses of business constituting the violations made use of a means or instrumentality of interstate commerce, or of the mails, and/or of the facilities of national securities exchanges.

17.     Venue in this District is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the District of Massachusetts.  Among other things, Nourafchan obtained some of the confidential nonpublic information that he tipped to the Tipping Scheme participants by accessing computer servers located in the District of Massachusetts belonging to one of his law firm employers ("Law Firm B," described below) and on which the confidential nonpublic information resided.  In addition, certain of the below-described call options were purchased or sold by the Defendants through the BOX Options Exchange, which is located in the District of Massachusetts.

**DEFENDANTS**

18.    **Nourafchan**, age 43, resides in Los Angeles, California.  Nourafchan is licensed to practice law in New York.  Nourafchan practiced law between 2012 and 2023 as a corporate associate at various corporate law firms, including Law Firm A and Law Firm B.

19.    **Yadgarov**, age 45, resides in Long Beach, New York.  Yadgarov has been licensed to practice law in New York since 2008 and operates his own law practice.

20.    **Mark Alperin** ("Alperin"), age 48, resides in Brooklyn, New York.  Alperin has been employed in the healthcare field and worked with Defendants Eli Kavian and Simon Fensterszaub.

21.    **Bishay**, age 47, resides in Simi Valley, California.  Bishay is a hair stylist who owns a salon in Santa Monica, California.  L. Nourafchan was a client of Bishay's.

22.    **David Bratslavsky** ("Bratslavsky"), age 42, resides in Puerto Rico and Ohio. Bratslavsky is a managing partner at a technology company and attended college with Yadgarov and Nourafchan.

23.    **Brian Fensterszaub**, age 45, resides in Hollywood, Florida.  Brian Fensterszaub is the brother of Defendants Mark and Simon Fensterszaub, is the brother-in-law of Defendant Joseph Suskind, and is related to Defendants Yisroel Horowitz and Gavryel Silverstein by marriage.

24.    **Mark Fensterszaub**, age 47, resides in Hollywood, Florida.  He is in the insurance adjusting business, is the brother of Defendants Brian and Simon Fensterszaub, and is related to Defendants Yisroel Horowitz and Gavryel Silverstein by marriage.

25.    **Simon Fensterszaub**, age 50, is a medical doctor who resides in Fort Lauderdale, Florida.  He is the brother of Defendants Brian and Mark Fensterszaub and is related to Defendants Yisroel Horowitz and Gavryel Silverstein by marriage.  Prior to mid-2021, Simon

Fensterszaub resided in New York and was employed by the same healthcare center as Defendants Eli Kavian, Alperin, and Seth Winslow.

26. **Gershowitz**, age 43, resides in New York, New York. Gershowitz has been licensed to practice law in New York since 2010.  Gershowitz practiced law between 2010 and 2024 at Law Firms C (2021-2024) and D (2010-2019).  Gershowitz attended college with Defendants Nourafchan and Yadgarov.

27. **Fernando Grinberg** ("Grinberg"), age 51, resides in Hallandale Beach, Florida. Grinberg works in real estate and had a prior business relationship with Defendant Brian Fensterszaub.  Brian Fensterszaub introduced Grinberg to Defendant Gavryel Silverstein in connection with the Tipping Scheme.

28. **Boruch Hatanian** ("Hatanian"), age 39, resides in Fort Lauderdale, Florida. Hatanian works in sales and is an associate of Defendant Simon Fensterszaub.

29. **Yisroel Horowitz** ("Horowitz"), age 50, resides in Hollywood, Florida.  Horowitz is in the insurance adjusting business and is related by marriage to Defendants Brian, Mark, and Simon Fensterszaub.

30. **Joseph Izsak** ("Izsak"), age 45, resides in Hollywood, Florida.  Iszak works in real estate and is a business associate of Defendants Brian, Mark, and Simon Fensterszaub.

31. **Daniel Kavian**, age 35, resides in Fort Lauderdale, Florida.  He is the brother of Defendant Eli Kavian.

32. **Eliyahu ("Eli") Kavian**, age 37, resides in Brooklyn, New York.  He is the brother of Defendant Daniel Kavian and has been employed as a physician's assistant by the same medical facility as Defendants Simon Fensterszaub, Alperin, and Seth Winslow.

33. **Nowel Milik** ("Milik"), age 52, resides in Brea, California.  Milik is the owner of an insurance company and has had a friendship with Defendant Bishay.

34.     **Lorenzo Nourafchan** ("L. Nourafchan"**),** age 38, resides in Los Angeles, California.  Lorenzo, who is the brother of Defendant Nourafchan, is the founder and CEO of Northstar Financial Advisory, LLC, a self-described fractional CFO and accounting firm.

35.     **David Ostrov** ("Ostrov"), age 49, resides in Clifton, New Jersey.  Ostrov works in real estate finance and is an associate of Defendant Simon Fensterszaub.

36.     **Gavryel Silverstein** ("Silverstein"), age 43, resides in Hollywood, Florida and is in the insurance adjusting business, where he works with Defendant Brian Fensterszaub; Silverstein is related to Defendants Brian, Mark, and Simon Fensterszaub by marriage. Silverstein and Defendant Nourafchan are close friends who grew up together.

37.     **Joseph Suskind** ("Suskind"), age 39, resides in Sunny Isles Beach, Florida. Suskind is in the insurance adjusting business and is the brother-in-law of Defendant Brian Fensterszaub.

38.     **Seth Winslow** ("Winslow"), age 47, resides in Teaneck, New Jersey.  Winslow is a podiatrist and worked at the same healthcare center as Defendants Simon Fensterszaub, Eli Kavian, and Alperin.  Winslow was a friend of Simon Fensterszaub.

**OTHER RELEVANT INDIVIDUALS AND ENTITIES**

39.     **Law Firm A** is a global law firm based in Los Angeles.

40.     **Law Firm B** is a global law firm headquartered in Boston.

41.     **Law Firm C** is a global law firm based in New York.

42.     **Law Firm D** is a global law firm based in New York.

**TYPES OF SECURITIES TRADED**

43.     In connection with the Tipping Scheme, Nourafchan, Yadgarov, and their co-defendants generally established "long" positions in companies that were targeted for acquisition by purchasing shares of common stock and call options.

44.     When a buyer purchases a call option on a stock, they have the opportunity, but not the obligation, to buy that stock for a specific price known as the "strike price" for a predetermined period, which ends on a fixed expiration date.  Options are typically purchased in the form of contracts, with a single contract typically representing a quantity of 100 shares of the underlying stock.

45.     When the underlying stock is trading at a price that is below the call option's "strike price," the option is described as being "out of the money" because it would not be profitable to exercise the option at that time.  In other words, an "out of the money" option lacks intrinsic value, and only gains value if the price of the underlying stock increases above the strike price before the option expires.

**FACTUAL ALLEGATIONS**

46.     In 2012, after his admission to the bar in New York, Nourafchan began working in New York City as a corporate lawyer.

47.     In or about 2019, Nourafchan moved to another New York City law firm ("Law Firm A") where he continued to work as a corporate associate.

48.     As of 2021, Nourafchan was working for a different firm ("Law Firm B") as a corporate associate.  While Nourafchan was primarily based in Law Firm B's offices in California, Law Firm B was headquartered at all relevant times in Boston.

**A.     Nourafchan and Yadgarov Recruit Gershowitz into the Tipping Scheme**

49.     Nourafchan, Yadgarov, and Gershowitz attended college together in the early 2000s.

50.     By at least 2017, both Nourafchan and Gershowitz were living in New York City and began socializing.  As Nourafchan and Yadgarov knew, Gershowitz was working as an M&A associate at Law Firm C.

51.     By 2018, Nourafchan began trying to persuade Gershowitz to join the Tipping Scheme.  Nourafchan confided in Gershowitz that he had a side business obtaining information on M&A deals and trading on that information.  On multiple occasions in or about 2018, Nourafchan described to Gershowitz how he obtained confidential information about mergers and acquisitions from his law firm's document management system, including that he searched the system using key words and viewed documents in preview or read-only mode so as to minimize any electronic trail of his access to the files.

52.     In late 2018, Gershowitz met with both Nourafchan and Yadgarov in New York, where they described the Tipping Scheme, including that Nourafchan took inside information from his law firm and provided it to others, including Yadgarov, who tipped others.  Nourafchan

and/or Yadgarov also stated that Yadgarov provided inside information to both domestic and foreign traders, and that Nourafchan and Yadgarov had generated several million dollars in illicit profits through the Tipping Scheme.

53.     By at least April 2019, Gershowitz began providing Nourafchan and Yadgarov with material nonpublic information that Gershowitz misappropriated from his law firm employer.  In April of 2019, Gershowitz provided inside information to Yadgarov regarding a divestiture transaction on which Gershowitz was staffed.  After the transaction was consummated, in or about August 2019, Gershowitz received a payment from Yadgarov.

**B.      Numerous Tippees Traded on Information that Nourafchan and Gershowitz Misappropriated**

54.     As described further below, Nourafchan obtained material nonpublic information about certain corporate Deals through his work as a corporate associate at multiple law firms, and misappropriated that confidential information, tipping it to Yadgarov and other participants in the Tipping Scheme.  Nourafchan either worked on the Deals directly or accessed Deal-related files while employed at Law Firms A and B.

55.     The Defendants generated substantial profits purchasing the securities of U.S.-traded companies that were being targeted for acquisition, and/or about which Nourafchan, Yadgarov, and/or Gershowitz had material nonpublic information, in advance of such information being disclosed to the public.

56.     Concerned about the possibility of law enforcement surveillance, many of the Defendants used coded language to disguise discussion of the Tipping Scheme.  For example, Defendants sometimes referred to tips as airline "flights."  Other coded references related to religious events or activities.  In some cases, for example, the dates of nonpublic corporate transactions were referred to as the dates on which a "rabbi" was scheduled to have "surgery."

12

Religious "learning" was used as code for passing inside information.  In addition, Nourafchan and Silverstein at times used pre-paid cell phones to communicate and thereby mitigate the risk of detection.

57.     Below are five illustrative examples in which various Defendants obtained material nonpublic information regarding publicly-traded companies, tipped that information to others, and/or traded in the securities of those companies while aware of and on the basis of that material nonpublic information.

**C.     Example 1:  Momenta Pharmaceuticals, Inc.**

58.     On August 19, 2020, Johnson & Johnson announced it entered into a definitive agreement to acquire Momenta Pharmaceuticals, Inc. ("Momenta") for $6.5 billion through an all-cash tender offer of $52.50 per share.  At that time, Momenta was a NASDAQ-traded public company (ticker:  MNTA).  Nourafchan's employer, Law Firm A, represented Momenta in connection with the transaction, which was codenamed "Project Mars" to safeguard the confidentiality of the potential acquisition.

59.     On April 15, 2019, Momenta entered into a confidentiality agreement with an affiliate of Johnson & Johnson to discuss a potential transaction between the two companies, which was superseded by a second confidentiality agreement executed on July 1, 2020.

60.     On or about July 8, 2020, Silverstein and Nourafchan met in person in Colorado.

61.     On or about July 14, 2020, Nourafchan obtained access to Law Firm A's files related to the transaction between Momenta and Johnson & Johnson.  Nourafchan, who was not assigned to work on the transaction, accessed electronic documents—which included a draft merger agreement, diligence review tracker, timeline, and signing checklist—that contained material nonpublic information regarding Johnson & Johnson's potential acquisition of Momenta.

62.      On July 16, 2020, at 1:20 a.m.,[3] Nourafchan messaged Silverstein, instructing him to call Nourafchan "in [the] am" and that he is "[l]ooking forward to learning a bissel[.]" "Learning" is a term that many of the Defendants used as code for passing inside information. Bissel means "a little bit" in Yiddish.  Silverstein responded:  "Yo tambien" (meaning "me too" in Spanish).

63.      Late on July 16, 2020, Nourafchan viewed confidential files at Law Firm A related to the Momenta transaction, including a transaction checklist and merger agreement.

64.      On July 17, 2020, Nourafchan and Silverstein exchanged several messages and had at least three brief telephone calls.

65.      Between July 20, 2020 and July 31, 2020, Nourafchan continued to access confidential files related to the Momenta transaction at Law Firm A, including a draft SEC Form 8-K filing, a board presentation, and a revised draft of the merger agreement.

66.      On August 2, 2020, Silverstein and Horowitz communicated several times by phone, with the calls lasting between 1 and 7 minutes.  At that time, Silverstein was participating in a WhatsApp group chat with Horowitz (nicknamed "Sruly") and Mark Fensterszaub (nicknamed "Uda"), as well as brothers Simon and Brian Fensterszaub.  The group chat was called "Brothers in the Market."  Participants in the "Brothers in the Market" group chat discussed a number of topics but primarily focused on trading securities.

67.      The following day, August 3, 2020, Horowitz bought 20 out-of-the-money Momenta call options with a strike price of $35.  As of that time, Momenta shares were trading in the range of $30 to $32.

---

[3] All times are approximate.  Unless otherwise indicated, all times are either EST or EDT depending on the communication date.

68.     On August 4, 2020, Nourafchan accessed a number of confidential documents maintained by Law Firm A related to the Momenta transaction.  These documents included a board presentation, board minutes, a working group list, and information about termination fees.

69.     Also on August 4, 2020, Horowitz and Silverstein spoke several times by phone, with the calls lasting for between 1 and 10 minutes.  Shortly after talking to Silverstein, Horowitz added to his Momenta options position, this time using a different brokerage account.

70.     Also on August 4, 2020, Simon Fensterszaub spoke by phone with Silverstein; the two men had a brief telephone call early in the afternoon and then talked two more times that day.  Simon Fensterszaub and Silverstein also texted multiple times that day (including a message from Silverstein saying "Uda trying to call u") and texted multiple times the following day, August 5, 2020, which included Simon Fensterszaub texting, "don't forget about me" and Silverstein replying, "I didn't[.]"

71.     On the evening of August 4, 2020, Nourafchan sent a WhatsApp message to Yadgarov stating:  "Call me to learn[.]"

72.     On the morning of August 5, 2020, Simon Fensterszaub called Silverstein, and the call lasted for just over half an hour.  Later in the day, after the call, Simon Fensterszaub bought five Momenta call options at a strike price of $37 and subsequently added to his position by purchasing Momenta shares as well as additional out-of-the-money Momenta call options in the following days.

73.     On August 6, 2020, Mark Fensterszaub and Silverstein talked on the phone for approximately 20 minutes.

74.     On August 7, 2020, Simon Fensterszaub called Defendant Alperin (nicknamed "Moshe"); the two men (who were then co-workers) spoke for approximately four minutes.

75.     The same day, August 7, 2020, Horowitz and Silverstein again spoke by phone, and after the call, Horowitz added to his out-of-the money Momenta call options position (this time purchasing call options with a strike price of $33).

76.     On August 10, 2020, Simon Fensterszaub and Eli Kavian (who were then co-workers) spoke on the phone at 12:10 p.m. for approximately three minutes.  Both Simon Fensterszaub and Eli Kavian bought out-of-the-money Momenta call options that same day. Then, on August 12, 2020, Simon Fensterszaub sent a WhatsApp message to Eli Kavian telling him "Check your AOL email. I just sent you something[.]"  After receiving this message, Eli Kavian added to his Momenta call options position on August 13, 2020.  Eli Kavian's brother Daniel Kavian also bought out-of-the-money Momenta call options the following day, August 14, 2020.

77.      On August 11, 2020, Mark and Simon Fensterszaub spoke by phone twice; their calls lasted for a total of approximately 26 minutes.  The following day, August 12, 2020, Mark Fensterszaub began purchasing Momenta shares.

78.     On August 14, 2020, Alperin began buying out-of-the-money Momenta call options.  Alperin also messaged a WhatsApp group labeled "Stock Traders"; the recipients included Eli Kavian and Simon Fensterszaub.  Alperin, Eli Kavian, and Simon Fensterszaub all worked together at that time.  Alperin wrote: "So the value for M[N]TA stocks are going up but not the price to sell. So we can't make a profit | Yet[.]"

79.     Also on August 14, 2020, approximately 6:00 p.m., Nourafchan sent Yadgarov a WhatsApp message that stated: "Trying to learn with you[.]"  Approximately 14 minutes later, Yadgarov replied: "I'm running to mikvah. Pls read last section I sent u[.]"[4]

---

[4] A mikvah is a bath in which certain Jewish ritual purifications are performed.

80.     Late in the day on August 16, 2020, Simon Fensterszaub attempted to call Hatanian and messaged him saying "call me when you have a moment[.]"  Simon Fensterszaub then messaged Hatanian the evening of August 17, 2020:  "According to my brother-in-law it is a done deal, the announcement will be either this week or next |  And for those reasons, is why I bought shares[.]"  Hatanian replied:  "can't trade on inside info - but fundamentals look good | and I've wanted to add a pharma company to my portfolio[.]"

81.     On August 18, 2020, Law Firm A—Nourafchan's employer—learned that Johnson & Johnson's board had approved the proposed merger agreement with Momenta.

82.     On August 19, 2020 at 6:34 a.m., Momenta formally announced that Johnson & Johnson would acquire the company for $52.50 per share in an all-cash transaction.  On the prior trading day, August 18, 2020, the closing price for Momenta stock was $30.81 per share.  After the announcement of Momenta's acquisition on August 19, 2020, the price of Momenta stock rose substantially, hitting $52.12 per share by the close of trading.

83.     At approximately 6:46 a.m. on August 19, 2020, Eli Kavian messaged the WhatsApp Stock Traders group chat to say that "[i]t looks like the flight took off this morning[.]"  ("Flight" was code for the Momenta announcement.)  Simon Fensterszaub responded by messaging the group chat a framed photograph of basketball star LeBron James, and Alperin messaged the group chat a picture of $100 bills.

84.     After the Momenta announcement, beginning on August 19, 2020, Defendants Horowitz, Simon Fensterszaub, Alperin, Mark Fensterszaub, Daniel Kavian, and Eli Kavian all liquidated their positions in Momenta securities.  On August 21, 2020, Simon Fensterszaub wrote to the Stock Traders group chat:  "Time to take the Money and run[.]"

85.     By trading Momenta securities, the below-listed Defendants, while aware of and on the basis of material nonpublic information, generated approximate net profits as summarized in the chart below:

| Defendant | Net Profit |
|---|---|
| Alperin | $21,168 |
| Mark Fensterszaub | $2,440 |
| Simon Fensterszaub | $14,135 |
| Horowitz | $40,240 |
| Daniel Kavian | $1,471 |
| Eli Kavian | $9,194 |

86.     On August 21, 2020, Daniel Kavian messaged Eli Kavian to say: "5k ready" and then on August 22, 2020, asked Eli Kavian: "R we donating to rabbi goldstone[.]" These were coded messages between the Kavians regarding the kickbacks to be paid for the Momenta tip.

87.     In late August of 2020, Nourafchan followed up with Silverstein to obtain a kickback for the insider trading tip Nourafchan had provided to Silverstein regarding the acquisition of Momenta. On August 26, 2020, Nourafchan messaged Silverstein: "Call me bro | You can run but you can't hide motherfucker[.]" Silverstein responded: "Haha. Give me 20," to which Nourafchan replied: "to life[.]" Silverstein then responded: "I hope not[.]" Then on September 10, 2020, Nourafchan said: "Bro I'm trying to reach you for days. Call me[.]" Then on September 11, 2020, Nourafchan told Silverstein that he left a voicemail and asked: "Bro you got the message? | Can you please arrange today?" Silverstein replied: "Yeah, I will try to arrange today. Worst comes to worst it will be done by Monday[.]" After a series of additional exchanges, including with a third party who was to receive the funds due to Nourafchan on

Nourafchan's behalf, Silverstein sent Nourafchan a screenshot of a $9,765 wire transfer to the third party, messaging "I'm sorry for the long delay," and "sent u confirmation." Nourafchan confirmed: "Just went through. Thank you bro!"

88. The above-referenced bid for Momenta contemplated an acquisition through means of a tender offer.

89. At the time Nourafchan and/or Yadgarov directly or indirectly tipped the above-named Defendants regarding these tender offers, a substantial step or steps to commence the offer – including negotiations, board meetings, the arrangement of financing, the hiring of advisors, and proposals – had been taken.

**D.     Example 2:  SailPoint Technologies Holdings, Inc.**

90. At 6:45 a.m. on April 11, 2022, SailPoint Technologies Holdings, Inc., ("SailPoint") announced that it had entered into a definitive agreement to be acquired by private equity firm Thoma Bravo in an all-cash transaction that valued SailPoint at approximately $6.9 billion. SailPoint, an enterprise identity security firm, had been trading on NASDAQ (ticker symbol: SAIL). The announcement noted that SailPoint shareholders would receive $65.25 per share, which represented a 48% premium to SailPoint's 90-day volume-weighted average trading price. In the wake of the announcement, the price of SailPoint stock spiked to $64.05 per share by the end of the trading day on April 11, 2022, representing a 29% increase from the prior day.

91. In early 2022, Nourafchan was working for Law Firm B. Law Firm B represented SailPoint in connection with the acquisition, which was codenamed "Flying Cloud" to safeguard the confidentiality of the matter.

92. While working as an associate for Law Firm B, Nourafchan, who was not assigned to work on the SailPoint transaction, accessed electronic documents relating to the acquisition in late March 2022. These documents contained material nonpublic information

regarding Thoma Bravo's acquisition of SailPoint.  The documents that Nourafchan accessed were stored on Law Firm B's computer servers located in the District of Massachusetts.

93.    On March 9, 2022, Nourafchan messaged Silverstein:  "Gearing up for a trip to Miami bro. Get ready. Will make up for last time."  Silverstein responded with emojis:  🙏👍[.] On March 10, 2022, Nourafchan messaged Silverstein, stating in relevant part, "Wanted to plan another trip with you. We'll be in touch[.]"  Silverstein responded in relevant part, "After last failed trip I have been bleeding. Need a refuah[.]"  "Refuah" is a Hebrew word meaning "healing."

94.    On March 28, 2022, Nourafchan accessed a signing checklist for the potential SailPoint acquisition.

95.    Also on March 28, 2022, after he had accessed the signing checklist for the potential SailPoint acquisition, Nourafchan called Silverstein for less than one minute.

96.    Also on March 28, 2022, Yadgarov texted Bratslavsky asking him if he was "around for mincha [*e.g.*, Jewish afternoon prayer service] and learning," which in this context was code for passing inside information.  Bratslavsky responded that he was around; they met later that day.

97.    On the morning of March 31, 2022, Silverstein and Horowitz exchanged several text messages.  At 2:24 p.m., Horowitz began buying out-of-the-money SailPoint call options with a strike price of $55 and an expiration date of May 20, 2022.  (At that time, SailPoint shares were trading in the range of $49 to $51 per share).  After selling some of his $55 call option contracts, Horowitz continued to purchase 117 additional SailPoint call options between April 1 and 6, 2022 at strike prices ranging from $45 to $60.  These additional call options had expiration dates in May and June 2022.

20

98.    On March 31, 2022, Bratslavsky entered an order to purchase 140 SailPoint call options but that order was not executed.

99.    On April 1, 2022, at 8:59 a.m., Bratlavsky purchased 14,000 shares of SailPoint stock for $51.73 to $51.74 per share.

100.    On April 5, 2022, at 12:54 p.m., Brian Fensterszaub bought 23 SailPoint call options with a strike price of $65 and an expiration date of May 20, 2022.

101.    On April 5, 2022, Silverstein messaged Simon Fensterszaub about sending Simon Fensterszaub money to invest in SailPoint securities. Silverstein wrote: "I wanna get you some money to put in. I should have 12k by tomorrow[.]" Simon Fensterszaub responded: "We will be in touch tomorrow morning. We are going to kill this[.]" On April 8, 2022, Simon Fensterszaub sent Silverstein his address, phone number, and the routing and account numbers for his bank account so that Silverstein could wire money for Fensterszaub to invest in SailPoint securities. Silverstein responded the same day: "Sending 10k now[.]" While Simon Fensterszaub waited for Silverstein's wire transfer to arrive in his bank account to trade SailPoint, Defendants Brian Fensterszaub, Grinberg, Mark Fensterszaub, and Suskind established positions in SailPoint securities.

102.    On April 6, 2022, Brian Fensterszaub purchased 29 additional SailPoint call options with a strike price of $65 and an expiration date of May 20, 2022. Brian Fensterszaub spoke and exchanged text messages with Silverstein frequently throughout the Relevant Period, including on April 3 and April 4, 2022.

103.    On April 6, 2022, at 2:52 p.m., Grinberg, who learned of the SailPoint acquisition from Silverstein, began buying 4 SailPoint call options with strike prices ranging from $55 to $65 and an expiration date of May 20, 2022. Grinberg also purchased 31.44 SailPoint shares on April 8, 2022, for $50.09 to $50.51 per share.

104.   On April 7, 2022, Mark Fensterszaub had a call that lasted approximately two hours with the brokerage firm Robinhood, learning how to trade options and trade on margin.

105.   On April 8, 2022, at 10:39 a.m., Brian Fensterszaub and Suskind had a four-minute phone call.  At 1:30 p.m., Suskind bought $8,000 worth of SailPoint stock for $49.73 per share.  At 1:31 p.m., Suskind also bought 200 SailPoint call options with a strike price of $60 and an expiration date of May 20, 2022.

106.   On April 8, 2022, at 11:58 a.m., Mark Fensterszaub, after calls that morning with his brothers Brian and Simon Fensterszaub, bought 150 SailPoint call options with a strike price of $60 and an expiration date of May 22, 2022.

107.   On April 11, 2022, at 6:45 a.m., SailPoint announced that it had entered into a definitive agreement to be acquired by Thoma Bravo in an all-cash transaction valued at approximately $6.9 billion.  As a result of this announcement, SailPoint's stock price increased by approximately 29.16%, to a closing price of $64.05, up from a closing price of $49.59 on April 8, 2022.

108.   On April 11, 2002, at 8:06 a.m., Simon Fensterszaub messaged his brother Brian, reflecting his surprise that the acquisition was announced earlier than expected:  "Ship just sailed!!! | Info was a little off again."

109.   On April 11, 2022, at 8:41 a.m., Silverstein—whose funds had not yet reached Simon Fensterszaub and therefore was unable to invest in SailPoint securities before the announcement—messaged Simon Fensterszaub expressing surprise and frustration at the timing of the acquisition announcement:  "Wtffffffffffffffff[.]"  Simon Fensterszaub responded:  "We just arrived at the airport to watch the plane takeoff[.] | Too little too late[.]"  Silverstein replied:  "Seriously. What a waste[.]"  Simon Fensterszaub shared Silverstein's frustration with missing

an opportunity to profit from their advance knowledge of the acquisition: "So basically nobody got in | This sucks!"

110.    Over the next several days, Simon Fensterszaub and Silverstein continued to discuss returning the $10,000 that Silverstein had sent to Simon and when they would next receive inside information.  On April 14, 2022, Silverstein messaged Simon Fensterszaub: "Hopefully we will get serious revenge on the next one. And it should come very soon."  On April 19, 2022, Simon Fensterszaub messaged Silverstein, "So……. When the next flight??" Silverstein responded:  "After pesach [Passover] we will see | The guy is in Morocco[.]" According to travel records, Nourafchan had departed the United States on or about April 12, 2022, and returned on or about April 28, 2022.  Nourafchan traveled to Morocco during his time outside the United States.

111.    The Defendants' approximate net profits from their SailPoint trades made while aware of and on the basis of material nonpublic information about the acquisition are summarized in the chart below:

| Defendant | Net Profit |
| --- | --- |
| Bratslavsky | $171,411 |
| Mark Fensterszaub | $45,999 |
| Grinberg | $2,378 |
| Horowitz | $69,004 |
| Suskind | $8,944 |

112.    Certain traders paid kickbacks for the SailPoint tips.  For example, in late April 2022, Bratslavsky withdrew substantial amounts of cash, and met with Yadgarov in early May 2022, providing him a portion of the profits Bratslavsky made trading SailPoint securities.

E.      **Example 3:  iRobot Corp.**

113.    On August 5, 2022, iRobot Corp. ("iRobot"), a global consumer robot company that traded on NASDAQ (ticker symbol "IRBT,") and Amazon Inc. announced they had entered a merger agreement under which Amazon would acquire iRobot for $61 per share in an all-cash transaction valued at approximately $1.7 billion.[5]

114.    Amazon first contacted iRobot about a potential acquisition in May 2022.

115.    Law Firm B represented iRobot in connection with the potential acquisition, which was codenamed "Project Integrator" to safeguard the confidentiality of the matter.

116.    While working as an associate for Law Firm B, Nourafchan, who was not assigned to work on the iRobot transaction, accessed electronic documents relating to the transaction at various times from at least June 7 through at least July 7, 2022.  These documents—which included a draft merger agreement, offer letter, and signing checklist—contained material nonpublic information regarding Amazon's potential acquisition of iRobot.  The documents Nourafchan accessed were stored on Law Firm B's computer servers located in the District of Massachusetts.

117.    On June 9, 2022, just two days after Nourafchan began accessing internal documents regarding the potential merger, Defendants Alperin, Brian, Mark, and Simon Fensterszaub, Grinberg, Hatanian, Horowitz, Izsak, Daniel and Eli Kavian, Ostrov, Suskind, and Winslow began taking positions in iRobot securities after speaking with Silverstein and other defendants.

118.    Grinberg and Silverstein met in person at a casino in Florida in June 2022 where Silverstein tipped Grinberg about the potential acquisition of iRobot.  Silverstein told Grinberg

---

[5] Ultimately, Amazon and iRobot mutually agreed to terminate the acquisition agreement.  The companies announced the termination on January 29, 2024.

that the tip came from the same lawyer who had provided Silverstein confidential information about other companies. On June 9, 2022, Grinberg and Silverstein spoke by phone at 2:11 and 2:29 p.m. A little more than an hour later, Grinberg began buying iRobot shares. At various times from June 9 until August 4, 2022 (the day before the public announcement about the merger), Grinberg continued to purchase iRobot shares, in addition to iRobot call options (mostly out-of-the money) with expiration dates in August and September 2022. Grinberg had not previously purchased iRobot securities at any point before the Tipping Scheme began.

119. Similarly, on June 9, 2022, Horowitz began purchasing out-of-the-money iRobot call options less than 20 minutes after he spoke by phone with Silverstein. Horowitz had not previously purchased iRobot securities at any point in the Relevant Period. Horowitz continued to purchase iRobot call options throughout June and July 2022, with his last purchase occurring on August 4, 2022—the day before the public announcement of Amazon's acquisition of iRobot. In all, Horowitz acquired 479 call options at strike prices between $38 and $56.

120. Silverstein began tipping certain other Defendants about Amazon's impending acquisition of iRobot on or around June 10, 2022, when he communicated with all three Fensterszaub brothers.

121. Silverstein spoke several times with Brian Fensterszaub by phone on June 10, 2022, with the last call occurring at 2:53 p.m. Silverstein tipped Brian Fensterszaub with material nonpublic information about the impending acquisition of iRobot while speaking with Brian Fensterszaub by phone. Less than an hour after that last call of the day with Silverstein, Brian Fensterszaub began purchasing out-of-the-money iRobot call options. He also purchased and sold iRobot shares beginning on June 16, 2022. Brian Fensterszaub had not previously purchased iRobot securities at any point before the Tipping Scheme began.

25

122.    In July 2022, Brian Fensterszaub later tipped his brother-in-law, Joseph Suskind, about the impending iRobot acquisition.  Beginning on July 20, 2022, and continuing through July 27, 2022, Suskind deposited $160,000 into his brokerage account.  Between July 20 and August 1, 2022, Suskind used all of the funds that he had deposited to purchase iRobot stock and out-of-the-money call options.  On July 20, 2022, the day that Suskind began purchasing iRobot securities, Brian Fensterszaub sent him a message stating "[l]ooks like it might b [sic] time 🤔 [thinking face emoji]," to which Suskind replied, "I put in 5k this morning[.]"  Suskind had purchased $5,000 worth of iRobot shares that morning.  Suskind and Brian Fensterszaub continued discussing Suskind's trading strategy until the acquisition was announced.  Between July 20 and August 1, 2022, Suskind bought 3,669.07 iRobot shares for prices ranging from $40.64 and $45.58 per share.  Between July 22 and July 27, 2022, Suskind bought 570 iRobot call options with strike prices ranging from $50 to $60 with expiration dates in August and September 2022.

123.    The same day that Silverstein tipped Brian Fensterszaub, June 10, 2022, Silverstein also tipped Brian's brother, Mark Fensterszaub about the iRobot acquisition.  At 5:07 p.m. Silverstein and Mark Fensterszaub spoke by phone for about 14 minutes.  Less than a half hour after speaking with Silverstein, Mark Fensterszaub began purchasing iRobot shares.  He purchased a total of 1,000 iRobot shares that day.  One week later, Mark Fensterszaub began purchasing iRobot call options.  He continued to purchase iRobot call options in June, July, and August 2022, with the last purchase occurring on August 4, 2022, the day before the public announcement of Amazon's acquisition of iRobot.  Those options entitled him to purchase 60,300 iRobot shares at strike prices between $45 to $55 by August and/or September 2022.  He also purchased an additional 300 shares of iRobot on August 4, 2022.  He had not previously purchased iRobot securities at any point before the Tipping Scheme began.

124.    The same day that Silverstein tipped Brian and Mark Fensterszaub, he communicated with their brother, Simon Fensterszaub, and tipped Simon about the iRobot transaction.  At 5:25 p.m., on June 10, 2022, Simon Fenstersnzaub sent a message to Silverstein about meeting each other in person that evening and specifically noted that he wanted "to talk about our flight" when they met.  About a minute later, Simon Fensterszaub messaged Silverstein again:  "There is no way in hell we are missing this one[.]"  Simon Fensterszaub was correct—as described below, he and all those that he tipped about the pending acquisition made timely purchases of iRobot securities and substantial profits on the basis of material nonpublic information that Simon Fensterszaub received from Silverstein.

125.     As of June 1, 2022, Simon Fensterszaub had a brokerage account with a balance of approximately $240.  On June 13, 2022, $50,000 was wired into Simon Fensterszaub's brokerage account, and on June 16, 2022, Simon Fensterszaub purchased 1,000 iRobot shares  in his brokerage account, for a total cost of more than $40,000.  At that time,the iRobot shares were the only securities Simon Fensterszaub held in that brokerage account.

126.    In addition to trading, Simon Fensterszaub began providing the confidential information he received from Silverstein to several other Defendants—Hatanian, Izsak, Eli Kavian, Orstrov, and Winslow—intending that these individuals buy iRobot securities based on that information.  Eli Kavian, in turn, tipped Alperin and his brother Daniel Kavian, intending that these Defendants buy iRobot securities based on that information.

127.    **Hatanian**.  On June 13, 2022, Simon Fensterszaub messaged Hatanian:  "I hope everything is going well. Call me when you have a moment to talk about the flight[.]"  The two spoke by phone that afternoon.  Two days later, on June 15, 2022, Hatanian purchased 1,000 iRobot shares for $42 per share, and bought 200 more shares at $41.10 per share the following day, June 16, 2022.  Hatanian also purchased various series of iRobot options (with August 19,

2022 expiration dates) between June 16 and August 2, 2022.  He also continued to purchase iRobot shares through July 29, 2022 at prices ranging from $42 to $46 per share.  Hatanian had not previously purchased iRobot securities before the Tipping Scheme began.

128.    Hatanian and Simon Fensterszaub—who himself began purchasing shares of iRobot on June 16, 2022 at $40.70 per share—continued to discuss the timing of the pending acquisition.  For example, on June 17, 2022, Simon Fensterszaub messaged Hatanian:  "I am running around on errands today. I hope to find out today when the Rabbi's surgery is going to take place[.]"  "Rabbi's surgery" was a coded reference to the announcement of the Amazon-iRobot transaction.  Hatanian responded:  "ok please let me know - I am praying!"

129.    Simon Fensterszaub continued to communicate with Silverstein, seeking updates about the Amazon-iRobot transaction, the status of which was not fully known to them during late June and early July 2022.  For instance, they engaged in a series of messages regarding the date "when the rabbi is scheduled for surgery"—referring in coded language to the anticipated date of the Amazon-iRobot transaction.  At one point, Simon Fensterszaub noted that he had "a friend that would like to donate towards the surgery but he wants to know when the surgery is scheduled for[.]"  Fensterszaub was referring to a friend who wanted to participate in the insider trading scheme by investing in iRobot securities but wanted to know when the merger was supposed to occur.  They continued to discuss the date of the transaction, even questioning whether it was going to occur at all.  "Is he still scheduled for surgery?"  Simon Fensterszaub asked on June 21, 2022.  "We are still waiting for the Dr. to check if it's still needed," Silverstein responded.  On June 27, 2022, Fensterszaub and Silverstein discussed whether Silverstein had any further information about the Amazon-iRobot transaction—*i.e.*, "how the Rabbi is feeling."  Below is an excerpt of their exchange:

| S. Fensterszaub | Any chance you can find out today how the Rabbi is feeling |
|---|---|
| S. Fensterszaub | ? |
| Silverstein | Unfortunately nothing |
| S. Fensterszaub | Dude that's scary |
| Silverstein | Yeah |
| Silverstein | Stagnant. No movement on the situation |
| S. Fensterszaub | Should I tell ppl to pull out? |
| S. Fensterszaub | Find out if we should bail |
| Silverstein | I'll see you soon |
| Silverstein | Actually not sure if I'm going out |
| S. Fensterszaub | So what should I advise ppl |
| Silverstein | Are they even |
| S. Fensterszaub | I could find out but based on the current price I would assume so |
| Silverstein | So pull. But we might go back at it shortly |
| S. Fensterszaub | I have to remember to tell people tomorrow |

130.    In the exchange above, Silverstein and Simon Fensterszaub were discussing whether Silverstein had any updates regarding the Amazon-iRobot transaction, and whether the lack of additional information suggested that Simon Fensterszaub should recommend to other traders that they exit their positions in iRobot securities ("pull out" or "bail").  Silverstein suggested that if they would not lose money by selling ("Are they even[?]"), they might consider selling, but that "we might go back at it shortly."

131.    Notwithstanding the concerns he expressed in June 2022 about the timing of the transaction, Simon Fensterszaub continued to purchase iRobot securities while in possession of

29

material nonpublic information in July 2022.  For example, on July 13, 2022, Simon Fensterszaub purchased an additional 100 iRobot shares for $3,840, along with 36 out-of-the-money iRobot call options with a strike price of $55 and an expiration date of September 16, 2022.

132.    In addition to purchasing iRobot securities based on the confidential information he received from Silverstein, Simon Fensterszaub tipped other defendants, as described below.

133.    **Eli Kavian**.  On June 12, 2022, Simon Fensterszaub messaged Eli Kavian: "I have some more flight information[."  Kavian responded, "Yalla…| Yallaaaaaaaa.[[.]"  On July 14, Eli Kavian purchased 142 out-of-the-money iRobot call options at a strike price of $50.  A week later, Eli Kavian purchased 45 more out-of-the-money call options at a strike price of $60.  All of the call options had an expiration date of September 16, 2022.

134.    **Ostrov**.  On July 29, 2022, at 1:50 p.m., Simon Fensterszaub called Ostrov; the call lasted a little less than three minutes.  They spoke again on July 31, 2022, at 2:36 a.m. for close to three and a half minutes.  The next morning, on August 1, 2022, Ostrov and Simon Fensterszaub spoke twice for a total of more than 7 minutes.  That same day, a $50,000 transfer into Ostrov's brokerage account cleared, and Ostrov purchased 200 iRobot shares at an average price of 45.35 per share.  He also purchased 5 out-of-the-money call options that day, with a strike price of $50, that expired on August 19, 2022.  Between August 2 and 4, he purchased 28 more call options, some of which were out-of-the money, with strike prices ranging from $48 to $55.  These call options also expired on August 19, 2022.

135.    **Daniel Kavian.**  Eli Kavian tipped his brother Daniel Kavian about the impending iRobot transaction in the summer of 2022.  On July 19, 2022, Daniel Kavian deposited $25,000 into one of his brokerage accounts and began buying out-of-the-money iRobot call options that same day.  Daniel Kavian made additional deposits of $54,000 into one of his

brokerage account between July 20 and August 3, 2022, and used the funds to purchase iRobot

shares and additional out-of-the money iRobot call options.  In all, beginning with his first

purchase on July 19, 2022, and ending with his last purchase on August 3, 2022, Daniel Kavian

purchased a total of 750 iRobot shares and 315 call options with strike prices ranging from $45

to $50.   The call options all expired in early or mid-September 2022.

136.    **Alperin.**  Eli Kavian also tipped Alperin about the impending iRobot transaction.

On August 1, 2022, Alperin spent $23,050 to purchase 130 iRobot call options with a strike price

of $55 and an expiration date of September 16, 2022.  That day, iRobot shares traded between

$44.55 and $47.29 per share.

137.    **Winslow.**  In the summer of 2022, Simon Fensterszaub tipped Winslow about the

pending acquisition of iRobot.  On August 1, 2022, after receiving material nonpublic

information regarding the pending Amazon-iRobot transaction, Winslow purchased 50 out-of-

the-money iRobot call options with a strike price of $52 and an expiration date of September 2,

2022.

138.    In addition, in the summer of 2022, Nourafchan also tipped his brother, L.

Nourafchan about the impending acquisition of iRobot, and L. Nourafchan then tipped the

confidential information to his hair stylist, Bishay.  Bishay then tipped the confidential

information about iRobot to his friend, Milik.

139.    On or about July 15, 2022, L. Nourafchan and Bishay attempted to arrange an in-

person meet up to discuss the potential acquisition of iRobot.  Also on July 15, 2022, Milik sent

Bishay a text message that appeared to be a coded request for a stock symbol.

140.    Milik began buying shares of iRobot as early as July 18, 2022, and continued

buying on July 19, 2022.

141.    Early on the morning of July 20, 2022, L. Nourafchan and Bishay were in contact to arrange a meeting regarding the potential Amazon-iRobot transaction.  Less than an hour after meeting with L. Nourafchan, Bishay sent Milik a text message instructing Milik to call him. Bishay then purchased 100 iRobot shares on or about July 21, 2022, and Milik continued to add to his position in iRobot securities on July 22, 2022, ultimately buying a total of 5,150 iRobot shares and 721 out-of-the-money call options with strike prices between $40 and $55 that expired on August 19, 2022.

142.    On July 28, 2022, Brian Fensterszaub forwarded a link to a news article entitled "Ex-US congressman among 9 charged in insider trading cases" via WhatsApp to his brother, Mark Fensterszaub, who responded by sending Brian Fensterszaub the Google search results for the phrase "insider trading definition."

143.    At 8:00 a.m. on August 5, 2022, iRobot and Amazon announced they had entered a merger agreement under which Amazon would acquire iRobot for $61 per share in an all-cash transaction valued at approximately $1.7 billion.  As a result of this announcement, iRobot's stock price increased by approximately 19.10%, to a closing price of $59.54, up from a closing price of $49.99 on August 4, 2022.  At 8:24 a.m. on August 5, Eli Kavian messaged Simon Fensterszaub a link to a CNBC article about the announcement.  At 9:18 a.m., Eli Kavian messaged Simon Fensterszaub:  "What happened to aug 12 lol | And $65," indicating that he expected the announcement to be made on August 12, 2022, and that the acquisition price would be $65 per share instead of $61.  Simon Fensterszaub responded:  "Last minute closing negotiations . . . I guess."

144.    Also on August 5, 2022, after the iRobot announcement, Milik texted Bishay: "You were right[.]"

145.    Also on August 5, 2022, after the iRobot announcement, Mark Fensterszaub messaged Silverstein to tell him that the loan balance Silverstein had accrued with him had been forgiven, and delivered this news with an emoji in the shape of a champagne bottle.  Silverstein responded with a champagne emoji and fist bump emojis.

146.    Following the announcement and increase in the price of iRobot shares, the above-described Defendants closed out their iRobot positions, earning trading profits summarized in the chart below:

| Defendant | Net Profit |
|---|---|
| Alperin | $38,135 |
| Bishay | $1,466 |
| Brian Fensterszaub | $23,985 |
| Mark Fensterszaub | $111,496 |
| Simon Fensterszaub | $43,710 |
| Grinberg | $22,968 |
| Hatanian | $96,840 |
| Horowitz | $136,253 |
| Daniel Kavian | $276,448 |
| Eli Kavian | $36,745 |
| Milik | $733,433 |
| Ostrov | $20,521 |
| Suskind | $171,079 |

147.    After the August 5, 2022 iRobot announcement, certain of the defendants began paying kickbacks to Nourafchan, Yadgarov, and others (via L. Nourafchan and other defendants)

for the tips of confidential information.  For example, Daniel Kavian sent a $2,500 payment to Simon Fensterszaub via the online payment system Zelle on August 30, 2022 as a kickback of the profits he generated from trading iRobot.  Also in August of 2022, Eli Kavian made a payment to Simon Fensterszaub at an in-person meeting that he understood would be routed to the attorney who provided the tips of confidential information. Also in August of 2022, Bishay collected money from Milik and provided it to L. Nourafchan as a kickback approximately one week after the iRobot announcement.

### Example 4:  Momentive Global, Inc.

148.    On March 13, 2023, Momentive Global Inc. ("Momentive"), the maker of the survey platform SurveyMonkey, publicly announced that it had entered into a definitive agreement to be acquired by a consortium led by Symphony Technology Group for approximately $1.5 billion.  Under the announced terms of the agreement, shareholders of Momentive, which traded under the ticker symbol MNTV on NASDAQ, would receive $9.46 per share.  According to a press release announcing the acquisition, the $9.46 per share acquisition price represented a premium of approximately 28% to the volume-weighted average closing price of Momentive stock for the 10 trading days ending on March 13, 2023.

149.    Law Firm B represented an investment bank that acted as a financial adviser to Momentive in connection with the potential acquisition, which was codenamed "Project Mercury" to safeguard the confidentiality of the matter.

150.    While working as an associate for Law Firm B, Nourafchan, who was not assigned to work on the Momentive transaction, accessed electronic documents relating to the transaction at least three times on February 14, 2023, March 3, 2023, and March 8, 2023.  These documents—which included a proposed merger agreement, an engagement letter between Momentive and an investment bank advising Momentive on the acquisition, and the investment

bank's assessment of the terms of the proposed merger, commonly known as a "fairness opinion" —contained material nonpublic information regarding Symphony Technology Group's potential acquisition of Momentive. The documents Nourafchan accessed were stored on Law Firm B's computer servers located in the District of Massachusetts.

151.    Nourafchan communicated with Silverstein by text message and a phone call late in the evening on March 9, 2023.

152.    Silverstein communicated confidential information regarding the acquisition to certain defendants, who shared the tips with other trading defendants, resulting in a series of purchases of Momentive stock and out-of-the-money call options beginning on March 10, 2023:

      a.  **Eli Kavian.** At 8:31 a.m., Eli Kavian, who learned of the acquisition from Simon Fensterszaub, began purchasing out-of-the-money Momentive call options at a strike price of $8. He sold those call options about 22 minutes later, and then began buying both Momentive shares and call options. Specifically, he bought 1,000 Momentive shares and 200 call options at a $7 strike price that expired on April 21, 2023. At 3:46 p.m., (a few hours after he last purchased Momentive securities) Eli Kavian sent Simon Fensterszaub a screen capture showing trading data for Momentive, which was depicted as trading at $7.74 per share. Soon thereafter, Eli Kavian messaged Simon Fensterszaub "Inshallah," an expression meaning "God willing." Eli Kavian subsequently tipped his brother, Daniel Kavian, as well as Alperin and Winslow, with the material nonpublic information about the upcoming Momentive transaction.

b.  **Alperin.**  Also at 8:31 a.m., Alperin, who learned of the pending acquisition of Momentive from Eli Kavian, bought 300 out-of-the-money Momentive call options at a strike price of $8 with an expiration date of April 21, 2023.

c.  **Daniel Kavian.**  At 8:34 a.m., Daniel Kavian began purchasing out-of-the-money Momentive call options and shares in three brokerage accounts. Specifically, he bought 19.449 Momentive shares and 1699 call options at strike prices of $7 to $9 , all with an expiration date of April 21, 2023.  Daniel Kavian learned of the pending acquisition from his brother, Eli Kavian, who in turn learned of the pending acquisition from Simon Fensterszaub.

d.  **Winslow.**  At 8:46 a.m., Winslow purchased 155 out-of-the-money call options at a strike price of $8 with an expiration date of April 21, 2023.  Eli Kavian tipped Winslow about the pending acquisition, explaining that the tip originated with the same lawyer as did previous tips, and that the tip had been passed through Simon Fensterszaub to Eli Kavian.

e.  **Simon Fensterszaub.**  At 9:04 a.m., Simon Fensterszaub bought 5,100 Momentive shares and 120 out-of-the-money Momentive call options at a strike price of $8 with an expiration date of April 21, 2023.

f.  **Brian Fensterszaub.**  At 11:09 a.m., Brian Fensterszaub  bought 6,800 Momentive shares and 50 out-of-the-money call options at a strike price of $7 with an expiration date of June 16, 2023.

g.  **Suskind.**  At 11:15 a.m., Suskind purchased $1 million of Momentive shares and later in the day purchased 1400 out-of-the-money call options at a $7 strike price with an expiration date of June 16, 2023.

36

h. **Horowitz.** Between 2:27 p.m. and 2:28 p.m., Silverstein exchanged six text messages with Horowitz. At 2:56 p.m., Horowitz began buying out-of-the-money Momentive call options, eventually building a position of 181 Momentive call options with strike prices of $4 to $7, all with an expiration date of April 21, 2023. On March 13, 2023, Horowitz purchased 20 additional out-of-the-money call options at a strike price of $3 with an expiration date of April 21, 2023.

i. **Mark Fensterszaub.** At 3:25 p.m., Mark Fensterszaub purchased 75 out-of-the-money Momentive call options at a strike price of $8 with an expiration date of April 21, 2023, along with 2587.516 Momentive shares.

j. **Grinberg.** On March 13, 2023, at 3:16 p.m., Grinberg, who learned of the pending acquisition from Horowitz, began purchasing Momentive shares and out-of-the-money call options. That afternoon, Grinberg purchased a total of 12.75 Momentive shares and 113 call options at various strike prices (the majority of which were out-of-the-money). The options all had an expiration date of April 21, 2023.

153. On March 13, 2023, at 5:56 p.m., after the close of the market, Momentive announced that it entered into an agreement to be acquired by a consortium led by Symphony Technology Group in an all-cash transaction valued at $1.5 billion. Under the terms of the agreement, Momentive shareholders were to receive $9.46 per share, which represented a premium of approximately 28% to the volume weighted average closing price of Momentive stock for the 10 trading days ending on March 13, 2023. As a result of this announcement, Momentive's stock price increased by approximately 20.21%, to a closing price of $9.28 on March 14, 2023, up from a closing price of $7.72 on March 13, 2023.

154.    Following the announcement, the above-described Defendants closed out their Momentive positions, earning trading profits summarized in the chart below:

| Defendant | Net Profit |
|---|---|
| Alperin | $16,600 |
| Brian Fensterszaub | $5,626 |
| Mark Fensterszaub | $3,151 |
| Simon Fensterszaub | $14,107 |
| Grinberg | $1,302 |
| Hatanian | $30,699 |
| Horowitz | $14,190 |
| Daniel Kavian | $13,322 |
| Eli Kavian | $18,984 |
| Ostrov | $2,843 |
| Suskind | $156,871 |
| Winslow | $2,610 |

155.    After the March 13, 2023 Momentive announcement, certain of the defendants began paying kickbacks to Nourafchan, Yadgarov, and others (routed through other defendants) for the tips of confidential information. For example, in or around mid-March 2023, Eli Kavian provided funds to his brother, Daniel Kavian, including a Zelle transfer of $7,500, for delivery to Simon Fensterszaub in Florida.  On or about March 24, 2023, Daniel Kavian messaged Simon Fensterszaub to say that he "was told to make a special delivery lol" and Simon Fensterszaub responded by providing his address to Daniel Kavian.  Daniel Kavian then paid Simon Fensterszaub in person for the tips of confidential information.

156.   **Example 5:  Enstar Group Limited**

157.   On July 29, 2024, the global insurance group Enstar Group Limited ("Enstar") announced that it had entered into a definitive merger agreement through which the investment firm Sixth Street and other investors would acquire Enstar for $5.1 billion, with shareholders receiving $338 per share when the merger closed.  At the time, Enstar stock was listed on NASDAQ and traded under the ticker symbol ESGR.  As a result of this announcement, Enstar's stock price decreased by approximately 6.07%, to a closing price of $327.17, down from a closing price of $348.31 on July 26, 2024.

158.   Beginning in April 2024, Gershowitz was staffed by his law firm employer (Law Firm D) on a potential transaction involving Enstar.  Gershowitz's employer represented the lead purchaser in the eventual Enstar transaction.  Law firm records show that on April 17, 2024, Gershowitz drafted a document related to the Enstar transaction entitled "Project Elk-Reinsurance Diligence Call Agenda Items."  Project Elk was the codename used to safeguard the confidentiality of the potential Enstar deal.

159.   In May 2024, Gershowitz met Yadgarov at a bookstore in New York and provided him with material nonpublic information about the potential Enstar acquisition.

160.   A few days later, Yadgarov and Gershowitz met again, and Yadgarov told Gershowitz that he and Nourafchan had purchased between $2 and $3 million in Enstar common stock.

161.   Between May 2024 and July 2024, Gershowitz met with Nourafchan and Yadgarov in person several times.

162.   On May 7, 2024, Suskind met in person with Brian Fensterszaub.  That afternoon, Suskind bought approximately 1,680 Enstar shares at $297.58 per share, for approximately

$500,000. About an hour later, Suskind and Brian Fensterszaub exchanged the following messages:

> Suskind:      Señor. Do you have any new information?
> Fensterszaub:  Hang bruva

163. At 11:17 a.m. the following morning, May 8, 2024, Suskind purchased approximately 1,660 Enstar shares at an average price of $301.20 per share, for approximately $500,000.

164. On May 9, 2024 at 6:27 a.m., Brian Fensterszaub sent two text messages to Suskind: "Joey!!! In [New York] for the day, [G]avy [Silverstein] callin [*sic*] u[.]" About a half hour later, Silverstein called Suskind via WhatsApp. Suskind and Silverstein (who are brothers-in-law) then met at a Starbucks café in Aventura, Florida at 7:15 a.m. the same morning.

165. Also on May 9, 2024—approximately four hours after the Starbucks meeting with Silverstein—Suskind began buying a large volume of Enstar shares. Within a two-hour window, Suskind bought approximately 10,809 Enstar shares at a total cost of $3.29 million.

166. The following day, May 10, 2024, Suskind added to his Enstar position, buying another 3,697 Enstar shares at a total cost of approximately $1.15 million.

167. Two days later, on May 12, 2024, Suskind and Brian Fensterszaub again exchanged text messages, with Suskind asking whether there was "any news regarding that situation," and Fensterszaub responding: "Nuttn honey."

168. Between May 13, 2024 and July 5, 2024, Suskind asked Brian Fensterszaub and Silverstein for updates on Enstar, met with Brian Fensterszaub in person multiple times, and added an additional 9,970 Enstar shares to his position at a total cost of more than $3 million.

169. In July 2024, Nourafchan looked at electronic documents related to the potential Enstar merger on Gershowitz's computer while the two of them were in Gershowitz's apartment.

Nourafchan was also able to review printed copies of certain documents related to the Enstar transaction while in Gershowitz's apartment.

170. Law Firm D records show that on July 11, 2024 at 10:22 a.m., Gershowitz's document management account accessed an electronic document entitled "Elk – Merger Agreement" and then a short time later, Gershowitz's document management account accessed an electronic document entitled "Elk – Merger Agreement Issues List."

171. On July 26, 2026, Suskind sold a small portion of his position (approximately 2,924 shares) when the price of Enstar shares rose. On July 29, 2024, after the transaction was announced by Enstar, Suskind sold the majority of his position (approximately 24,711 shares). Given that Enstar's acquisition price ($338 per share) was below the price at which its stock had been trading immediately before the announcement, the price of Enstar shares declined after the July 29, 2024 announcement. Because Suskind had purchased his Enstar shares months earlier when the stock was trading at lower prices, he was able to sell his Enstar shares at a profit and reap ill-gotten gains of approximately $630,000.

172. After the July 29, 2024 announcement that Enstar had entered into a merger agreement, in or about August 2024, Yadgarov and Gershowitz met in midtown Manhattan. At the meeting, Yadgarov gave Gershowitz a cash payment, which Gershowitz was told was a portion of the trading profits obtained by Nourafchan and Yadgarov from trading Enstar. While Gershowitz was owed $30,000 from the Enstar trading, he received a smaller amount, because Yadgarov kept the majority of the illicit proceeds as repayment for a loan he had previously made to Gershowitz for apartment renovations.

173. In addition, Nourafchan and/or Yadgarov directly or indirectly tipped Defendants Bishay, Bratslavsky, Brian Fensterszaub, Simon Fensterszaub, Grinberg, Horowitz, Izsak, Daniel Kavian, Eli Kavian, Milik, and Winslow about at least seven other corporate transactions

41

involving Law Firms A, B, C, and/or D in the same or similar manner as described above. Specifically, while in possession of and based on material nonpublic information so misappropriated from Law Firms A, B, C, and/or D, Bishay, Bratslavsky, Brian Fensterszaub, Simon Fensterszaub, Grinberg, Horowitz, Izsak, Daniel Kavian, Eli Kavian, Milik, and Winslow placed profitable trades ahead of market-moving transactions in publicly-traded companies as summarized in the charts below:

### Summary of Additional Deals Traded by Defendants

| Issuer Name (Ticker) | Announcement Date | Description of News and Defendants' Trading |
|---|---|---|
| DSP Group, Inc. (DSPG) | August 30, 2021 | Synaptics Inc. announced the signing of a definitive agreement to acquire DSP Group at $22 per share in an all-cash transaction. Defendants Bratslavsky and Grinberg traded profitably in DSPG ahead of this announcement. |
| Citrix Systems Inc. (CTXS) | January 31, 2022 | Citrix entered into a definite agreement under which a consortium led by Vista Equity Partners would acquire it for $16.5 billion. Defendant Horowitz traded profitably in CTXS ahead of this announcement. |
| Poshmark, Inc. (POSH) | October 3, 2022 | Poshmark entered into a definitive agreement under which Naver would acquire it for approximately $1.2 billion. Defendants Simon Fensterszaub, Grinberg, Horowitz, and Suskind traded profitably in POSH ahead of this announcement. |
| KnowBe4, Inc. (KNBE) | October 12, 2022 | KnowBe4 entered into a definitive agreement to be acquired by Vista Equity Partners for approximately $4.6 million. Defendants Bishay, Brian Fensterszaub, Simon Fensterszaub, Grinberg, Horowitz, Milik, and Suskind traded profitably in KNBE ahead of this announcement. |
| Qualtrics International Inc. (XM) | March 13, 2023 | Qualtrics entered into a definitive agreement to be acquired by Silver Lake for approximately $12.5 billion. Defendants Grinberg, Izsak, Daniel Kavian, and Suskind traded profitably in XM ahead of this announcement. |
| Berkshire Grey, Inc. (BGRY) | March 24, 2023 | Berkshire Grey entered into a definitive merger agreement with SoftBank Group Corp. where SoftBank would acquire all stock not currently owned by SoftBank for $1.40 per share. Defendants Simon Fensterszaub, Horowitz, Eli Kavian, and Suskind traded profitably in BGRY ahead of this announcement |
| NextGen Healthcare, Inc. (NXGN) | September 6, 2023 | NextGen agreed to be acquired by Thoma Bravo for $23.95 per share. Defendant Suskind traded profitably in NXGN ahead of this announcement. |

**Overall Approximate Trading Profits for All Deals Traded by Defendants**

| Trader | Tickers Traded | Total Approximate Profits |
|---|---|---|
| Boruch Hatanian | IRBT and MNTV | $128,000 |
| Brian Fensterszaub | BGRY, IRBT, KNBE, and MNTV | $41,000 |
| Daniel Kavian | IRBT, MNTA, MNTV, and XM | $293,000 |
| David Bratslavsky | DSPG and SAIL | $329,000 |
| David Ostrov | IRBT and MNTV | $23,000 |
| Eli Kavian | BGRY, IRBT, MNTA, and MNTV | $67,000 |
| Fernando Grinberg | DSPG, IRBT, KNBE, MNTV, POSH, SAIL, and XM | $87,000 |
| Joseph Izsak | IRBT and XM | $62,000 |
| Joseph Suskind | BGRY, IRBT, KNBE, MNTV, NXGN, POSH, SAIL, XM, and ESGR | $3,000,000 |
| Mark Alperin | IRBT, MNTA, and MNTV | $76,000 |
| Mark Fensterszaub | IRBT, MNTA, MNTV, and SAIL | $163,000 |
| Miakel Bishay | IRBT and KNBE | $2,000 |
| Nowel Milik | IRBT and KNBE | $1,200,000 |
| Seth Winslow | IRBT and MNTV | $21,000 |
| Simon Fensterszaub | BGRY, IRBT, KNBE, MNTA, MNTV, and POSH | $82,000 |
| Yisroel Horowitz | BGRY, CTXS, IRBT, KNBE, MNTA, MNTV, POSH, and SAIL | $271,000 |

**FIRST CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(Nourafchan and Gershowitz)*

174.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 173 above as if they were fully set forth herein.

175.    Nourafchan and Gershowitz provided, or caused to be provided, material nonpublic information to one or more tippees, including their co-Defendants, knowing or having a reasonable expectation or recklessly disregarding that the tippee(s) would trade and/or tip others to trade on the basis of that information.  In each such instance, a reasonable investor would have viewed the information as being important to his or her investment decision.

176.    Nourafchan and Gershowitz had a duty to maintain the confidentiality of the material nonpublic information they tipped to others by virtue of their employment with Law Firms A and B (Nourafchan), and Law Firms C and D (Gershowitz).  Nourafchan and Gershowitz breached those duties by providing such material nonpublic information to others for use in connection with securities trading and in exchange for personal benefits or with the expectations of receiving a benefit.

177.    By engaging in the conduct described above, Nourafchan and Gershowitz, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

(a)     employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

178.    By reason of the actions alleged herein, Defendants Nourafchan and Gershowitz violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

*(Yadgarov, Alperin, Bishay, Bratslavsky, Brian Fensterszaub, Mark Fensterszaub, Simon Fensterszaub, Grinberg, Hatanian, Horowitz, Izsak, Daniel Kavian, Eliyahu Kavian, Milik, L. Nourafchan, Ostrov, Silverstein, Suskind, and Winslow)*

179.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 173 above as if they were fully set forth herein.

180.    Defendants Yadgarov, Alperin, Bishay, Bratslavsky, Brian Fensterszaub, Mark Fensterszaub, Simon Fensterszaub, Grinberg, Hatanian, Horowitz, Izsak, Daniel Kavian, Eliyahu Kavian, Milik, L. Nourafchan, Ostrov, Silverstein, Suskind, and Winslow traded, and/or tipped other individuals to trade, securities while aware, and on the basis, of material nonpublic information.  Defendants Yadgarov, Alperin, Bishay, Bratslavsky, Brian Fensterszaub, Mark Fensterszaub, Simon Fensterszaub, Grinberg, Hatanian, Horowitz, Izsak, Daniel Kavian, Eliyahu Kavian, Milik, L. Nourafchan, Ostrov, Silverstein, Suskind, and Winslow knew, recklessly disregarded, or consciously avoided knowing that such information was material and nonpublic. Defendants Yadgarov, Alperin, Bishay, Bratslavsky, Brian Fensterszaub, Mark Fensterszaub, Simon Fensterszaub, Grinberg, Hatanian, Horowitz, Izsak, Daniel Kavian, Eliyahu Kavian, Milik, L. Nourafchan, Ostrov, Silverstein, Suskind, and Winslow also knew, recklessly disregarded, or consciously avoided knowing that such material nonpublic information had been conveyed and/or obtained in breach of a duty or obligation arising from a similar relationship of trust or confidence.

181.    By engaging in the conduct described above, Defendants Yadgarov, Alperin, Bishay, Bratslavsky, Brian Fensterszaub, Mark Fensterszaub, Simon Fensterszaub, Grinberg, Hatanian, Horowitz, Izsak, Daniel Kavian, Eliyahu Kavian, Milik, L. Nourafchan, Ostrov, Silverstein, Suskind, and Winslow, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers or sellers of securities.

182.   By reason of the actions alleged here, Defendants Yadgarov, Alperin, Bishay, Bratslavsky, Brian Fensterszaub, Mark Fensterszaub, Simon Fensterszaub, Grinberg, Hatanian, Horowitz, Izsak, Daniel Kavian, Eliyahu Kavian, Milik, L. Nourafchan, Ostrov, Silverstein, Suskind, and Winslow violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder*
*(Nourafchan and Silverstein)*

183.   The Commission re-alleges and incorporates by reference Paragraphs 1 through 89 above as if they were fully set forth herein.

184.   By engaging in the conduct described above, Nourafchan and Silverstein, prior to the public announcement of tender offers by companies including Momenta Pharmaceuticals, Inc., and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to each of the tender offers, which information they knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, communicated material nonpublic information relating to each of the tender offers under circumstances in which it was reasonably foreseeable that the communication was likely to result in the purchase and sale of the securities sought or to be sought by such tender offers.

185.   By reason of the actions alleged herein, Nourafchan and Silverstein violated and, unless restrained and enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

46

## FOURTH CLAIM FOR RELIEF

*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder*
*(Alperin, Horowitz, Simon Fensterszaub, Mark Fensterszaub, Daniel Kavian, and Eliyahu Kavian)*

186.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 89 above as if they were fully set forth herein.

187.    By engaging in the conduct described above, Horowitz, Simon Fensterszaub, Mark Fensterszaub, Eli Kavian, Daniel Kavian, and Alperin, prior to the public announcement of tender offers, including Momenta Pharmaceuticals, Inc., and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to the tender offers, which information each knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, purchased or caused to be purchased or sold or caused to be sold the securities sought or to be sought by such tender offers.

188.    By reason of the actions alleged herein, Horowitz, Simon Fensterszaub, Mark Fensterszaub, Eli Kavian, Daniel Kavian, and Alperin, violated and, unless restrained and enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

#### I.

Permanently restraining and enjoining the Defendants from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

#### II.

Permanently restraining and enjoining Defendants Nicolo Nourafchan, Gavryel Silverstein, Yisroel Horowitz, Simon Fensterszaub, Mark Fensterszaub, Eliyahu Kavian, Daniel Kavian, and Mark Alperin from violating, directly or indirectly, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3]

#### III.

Ordering each Defendant to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the violations alleged herein, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

#### IV.

Ordering the Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l];

#### V.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

#### VI.

Granting such further relief as this Court may determine to be just and appropriate.

## **JURY DEMAND**

The Commission demands a trial by jury.

Dated: May 6, 2026                    By:    _____

Rua M. Kelly (Mass. Bar No. 643351)
U.S. Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
Kelly direct: (617)-573-8941
Email:  kellyru@sec.gov

49