**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

NICOLO NOURAFCHAN et al.,

Defendants.

**Civil Action No. 26-cv-12068 (LTS)**

# PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this reply memorandum in support of its Motion for Leave to File a Second Amended Complaint (the "Motion to Amend"). Defendant Hatanian opposes the Motion to Amend on the grounds of futility and undue prejudice.[1] As set forth below, the proposed amended pleading includes sufficient factual allegations to establish a facially plausible claim that Hatanian traded on inside information in violation of federal securities law. To argue futility, Hatanian invites the Court to both disregard its obligation to draw all reasonable inferences in favor of the Commission and analyze the allegations against Hatanian in a vacuum, rather than in the specific context of the tipping scheme at issue. The Court should decline this invitation and grant the Motion to Amend.

[1] Hatanian argues amendment would be unduly prejudicial because he would be unable to meet the motion deadline imposed by the agreed stay order (ECF No. 77), which required filing motions to dismiss within 45 days. (ECF No. 97, Opp. at 20.) Undersigned counsel, however, already conveyed in a prior meet and confer with Hatanian's counsel that the Commission would consent to an extension of the 45-day period to permit Hatanian to renew or refile his motion to dismiss based on the allegations in the Second Amended Complaint. Because there is no actual prejudice, let alone undue prejudice, to Hatanian at this preliminary stage of the case, nor any suggestion of "undue delay, bad faith, or dilatory motive," the Commission's reply focuses on his futility argument.

## Factual Background

It is axiomatic that the federal securities laws prohibit doing indirectly what one cannot do directly. Nonetheless, in opposing leave to amend, Hatanian emphasizes that he was a "remote" tippee. (ECF No. 97 at 2, 3, 4, 11, 16.) His so-called remoteness, however, was by design. Indeed, it was essential to the insider trading scheme. Nourafchan – as a central figure in this scheme – understood that it was risky to misuse his employers' confidential information for personal gain; hence he did not trade himself and instead tipped such information to traders *through intermediaries* with the expectation that he would share the trading profits. (ECF No. 89-1 at ¶¶ 1-12, 52-56.) His childhood friend, Silverstein, served as such a middleman. (*Id*. at ¶¶ 7, 8, 37.)

Given his close ties to Nourafchan, Silverstein did not trade either. Rather, he communicated the material nonpublic information he received from Nourafchan to others who profitably traded on the information and/or recruited traders who did so. (*Id*. at ¶¶ 7, 8, 37.) The whole point was to create separation or "levels" between the original source of the information and the scheme participants who traded to mitigate risk of detection. Defendants also used coded language (such as references to "flights" and the "Rabbi's surgery") when discussing insider tips. (*Id*. at ¶¶ 57, 84, 110, 111, 125, 128, 132, 133, 137.) At times, Nourafchan and Silverstein took the precaution of speaking via pre-paid cell phones. (*Id*. at ¶ 57.) In this covert way, information flowed through the channels of the tipping chain, and then later a portion of the trading profits flowed back upstream. (*Id*. at ¶¶ 7, 87, 88, 113, 151, 159.) Thus, the tipping levels noted by Hatanian were purposeful, as aptly demonstrated by his attempt to extricate himself from this case, pre-discovery, on the grounds he is a "third-level" tippee. (ECF No. 97, Opp. at 2.)

Hatanian is not as removed from the scheme as he contends. Hatanian received material nonpublic information directly from Simon Fensterzaub ("S. Fensterzaub"), who was closely

associated with Silverstein, the middleman. (ECF 89-1 at ¶ 8.) S. Fensterzaub is Silverstein's brother-in-law. (*Id*. at ¶26.) S. Fensterzaub's two brothers, one of whom worked with Silverstein, were also involved in the insider trading scheme. (*Id*. at ¶ 8.) Hatanian understood that S. Fensterzaub's source was Silverstein. (*Id*. at ¶ 57 ("According to my brother-in-law …").) Hatanian also understood that the information passed to him by S. Fensterzaub was "inside info" – *i.e.*, information that originated from breach of an insider's duty or an obligation arising from a similar relationship of trust or confidence. (*Id*. at ¶¶ 81, 128, 156(h).) Hatanian's receipt of material nonpublic information and his parallel trading with other tippees is summarized below.

**Momenta Pharmaceuticals, Inc. ("Momenta"):** By at least July 2020, Nourafchan began tipping Silverstein who, in turn, began tipping S. Fensterzaub who, as intended, began trading on this material nonpublic information and recruiting additional traders, including Hatanian. (*Id*. at ¶¶ 59-86.) Although on the first occasion of a tip about Momenta, Hatanian did not trade prior to the company's acquisition announcement just a few days later, the "inside info" he received from S. Fensterzaub—"the announcement will be either this week or next"—proved accurate and valuable. (*Id*. at ¶¶ 81-83.) Numerous defendants who had earlier communicated with S. Fensterzaub, before Hatanian, were able to profit from trading in advance of the news. (*Id*. at ¶¶ 75, 77-79, 86.) On this first occasion, S. Fensterzaub had also overtly signaled in writing to Hatanian that he had inside information. (*Id*. at ¶ 81.) With this paper trail, it is reasonable to infer Hatanian knew he ran a high risk if he traded Momenta.

| | |
|---|---|
| **July 14 – August 4, 2020** | Nourafchan accesses electronic files of Law Firm A containing material nonpublic information regarding potential acquisition of Momenta; Nourafchan and Silverstein communicate by phone and text (on July 17-18) (*Id*. at ¶¶ 62-66, 69). |
| **August 4-5, 2020** | Silverstein and S. Fensterzaub communicate by phone, text (*Id*. at ¶¶ 71, 73). |
| **August 5, 2020** | S. Fensterzaub begins to purchase Momenta securities (*Id*. at ¶ 73). |

| | |
|---|---|
| **August 10, 2020** | S. Fensterzaub speaks by phone with co-worker E. Kavian; they both proceed to purchase Momenta call options (*Id*. at ¶ 77). |
| **August 11, 2020** | S. Fensterzaub speaks by phone with M. Fensterzaub (*Id*. at ¶ 78). |
| **August 12, 2020** | M. Fensterzaub begins purchasing Momenta shares (*Id*. at ¶ 78). |
| **August 12, 2020** | S. Fensterzaub sends E. Kavian WhatsApp message: "Check your AOL email I just sent you something" (*Id*. at ¶ 77). |
| **August 13, 2020** | E. Kavian adds to his Momenta call options position (*Id*. at ¶ 77). |
| **August 14, 2020** | S. Fensterzaub's co-worker Alperin begins buying Momenta call options and communicates via WhatsApp with S. Fensterzaub and E. Kavian regarding Momenta stock price (*Id*. at ¶ 79). |
| **August 16, 2020** | S. Fensterzaub calls Hatanian and sends follow up message: "call me when you have a moment" (*Id*. at ¶ 81). |
| **August 17, 2020** (evening) | S. Fensterzaub messages Hatanian: "According to my brother-in-law it is a done deal, the announcement will be either this week or next \| And for those reasons, is why I bought shares" (*Id*. at ¶ 81). |
| **August 17, 2020** (evening) | Hatanian replies to S. Fensterzaub: "can't trade on **inside info** - but fundamentals look good \| and I've wanted to add a pharma company to my portfolio" (*Id*. at ¶ 81, emphasis added). |
| **August 19, 2020** (6:34 am) | Momenta announces Johnson & Johnson to acquire the company; stock price of MNTA increases over $21 per share from prior day (*Id*. at ¶ 83). |
| **August 19, 2020** (6:46 am) | E. Kavian sends message, via WhatsApp group chat, to S. Fensterzaub and Alperin: "[i]t looks like the **flight** took off this morning" (*Id*. at ¶ 84, emphasis added). |
| **August 21-22, 2020** | E. Kavian and D. Kavian exchange messages regarding kickback payments for tip regarding Momenta acquisition (*Id*. at ¶ 87). |
| **August 26, 2020** | Nourafchan follows up with Silverstein to obtain kickback payment (which is sent in September) for the Momenta tip (*Id*. at ¶ 88). |

**iRobot Corp. ("iRobot")**: Having never purchased iRobot securities in the past, Hatanian did so during, plus shortly after, the window of time when Nourachan repeatedly accessed confidential deal files of Law Firm B. Having been tipped about the pending acquisition by S. Fensterzaub, and with the knowledge that the tip came from an insider, Hatanian generated trading profits of $96,840. (*Id*. at ¶¶ 128-132, 150.) Hatanian traded in parallel with S. Fensterzaub, plus twelve other codefendants. (*Id*. at ¶ 150.)

| | |
|---|---|
| **April 19, 2022** | S. Fensterzaub messages Silverstein about the timing of the "next **flight**" and Silverstein responds: "After pesach [Passover] we will see \| The guy is in Morocco[.]" (*Id.* at ¶ 111, emphasis added.) |
| **April 28, 2022** | Nourafchan returns to the United States after traveling outside the country, including to Morocco. (*Id.*) |
| **June 7 – July 7, 2022** | Nourafchan accesses Law Firm B's electronic files containing material nonpublic information about the acquisition of iRobot (*Id.* at ¶ 117). |
| **June 10, 2022** | Silverstein tips all three Fensterzaub brothers about the contemplated iRobot acquisition; B. Fensterzaub and M. Fensterzaub begin to purchase iRobot securities; S. Fensterzaub messages Silverstein about discussing "our **flight**" (*Id.* at ¶¶ 122, 124, 125). |
| **June 12, 2022** | S. Fensterzaub messages E. Kavian, "I have some more **flight** information" (E. Kavian and his brother, D. Kavian, later purchase iRobot securities in mid-July) (*Id.* at ¶¶ 137, 139, emphasis added). |
| **June 13, 2022** | S. Fensterzaub messages Hatanian "about the **flight**" and they speak by phone (*Id.* at ¶ 128, emphasis added). |
| **June 15, 2022** | Hatanian purchases shares of both iRobot and Amazon (*Id.* at ¶ 128). |
| **June 16, 2022** | S. Fensterzab and Hatanian purchase iRobot shares (*Id.* at ¶¶ 126, 128). |
| **June 17, 2022** | S. Fensterzaub messages Hatanian that he "hope[s] to find out today when the **Rabbi's surgery** is going to take place" and Hatanian responds "ok please let me know – I am praying" (*Id.* at ¶ 132, emphasis added). |
| **June 21, 2022** | S. Fensterzaub and Silverstein exchange messages on or about this date concerning the "**Rabbi**" and his "**surgery**" (*Id.* at ¶ 133, emphasis added). |
| **June 27, 2022** | S. Fensterzaub and Silverstein exchange messages about "how the **Rabbi** is feeling;" S. Fensterzaub asks if he should advise "ppl to pull out" and "if we should bail;" to which Silverstein responds "Are they even" and S. Fensterzaub replies "I could find out but based on the current **price** I would assume so" (*Id.* at ¶¶ 133, 134, emphasis added). |
| **July 13, 2022** | S. Fensterzaub purchases additional iRobot securities (*Id.* at ¶ 135). |
| **July 29 – August 2, 2022** | Hatanian takes more bullish position in iRobot securities, selling some of his iRobot stock and trading in various iRobot options (*Id.* at ¶¶ 129-131). |
| **August 5, 2022** | iRobot and Amazon announce merger agreement under which Amazon would acquire iRobot for $61 per share; E. Kavian messages S. Fensterzaub, asking "What happened to aug 12 lol \| And $65;" iRobot's stock price increases by approximately 19.10%, from closing price of $49.99 on August 4 to closing price of $59.54 on August 5 (*Id.* at ¶ 147). |
| **August 30, 2022** | D. Kavian makes kickback payment to S. Fensterzaub; E. Kavian also makes payment to S. Fensterzaub in August (*Id.* at ¶ 151). |

**Momentive Global, Inc. ("Momentive")**: Having never purchased Momentive securities in the past, Hatanian invested more than $100,000 in Momentive just three days prior to the public announcement of Momentive's acquisition. (*Id*. at ¶ 156(h).) Having been tipped about the pending deal by S. Fensterzaub, and with the knowledge that the tip came from an insider, Hatanian generated trading profits of $30,699. (*Id*. at ¶ 156(h), 158.) Hatanian traded in parallel with S. Fensterzaub, plus eleven other codefendants. (*Id*. at ¶ 158.)

| | |
|---|---|
| **February 14 – March 8, 2023** | Nourafchan accesses electronic documents of Law Firm B containing material nonpublic information regarding potential acquisition of Momentive (*Id*. at ¶ 154). |
| **March 9, 2023** | Nourafchan communicates with Silverstein by text message and phone call (*Id*. at ¶ 155); on or about this date, Silverstein communicates confidential information about the Momentive acquisition directly or indirectly to other defendants, including S. Fensterzaub (*Id*. at ¶ 156). |
| **March 10, 2023** | Ten different defendants purchase Momentive securities this day (Friday), most within minutes or hours of each other, including S. Fensterzaub and Hatanian (*Id*. at ¶ 156). |
| **March 13, 2023** | The very next trading day (Monday), after the close of the market, Momentive announces that it had agreed to be acquired by a consortium led by Symphony Technology Group; Momentive's stock price increases by approximately 20.21%, from a closing price of $7.72 on March 13 to a closing price of $9.28 on March 14 (*Id*. at ¶ 157). |

## Argument

Rule 15(a)(2) provides that courts "should freely give leave [to amend] when justice so requires." *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Plaintiffs are typically permitted to amend under Rule 15(a) unless the party seeking to amend has engaged in "undue delay, bad faith, or dilatory motive," the requested amendment would impose "undue prejudice [on] the opposing party," or the amendment would be futile. *See Hogan v. InStore Group, LLC*, 512 F. Supp. 3d 157, 168 (D. Mass. 2021) (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 55 (1st Cir. 2008) (allowing motion to amend complaint after discovery had closed)).

## I. The Applicable Standard of Review.

In assessing whether the Commission's amendment is futile, the standard applied to a Rule 12(b)(6) motion to dismiss "is the standard for futility." *See Brooks v. Citizens Bank of Mass*., 2020 WL 837375, at *2 (D. Mass. Feb. 20, 2020) (denying motion to amend where complaint failed to meet pleading standards of Rule 12(b)(6) and where each claim was time-barred); *Largesse v. H&M Intern. Transp., Inc.*, 76 F. Supp. 3d 360, 362 (D. Mass. 2015) (permitting motion to amend to add additional claims two and a half months after defendants moved to dismiss).

Thus, the Court must accept all well-pleaded facts in the proposed Second Amended Complaint as true and draw all reasonable inferences in the Commission's favor. *SEC v. Tambone*, 550 F.3d 106, 118 (1st Cir. 2008), *rev'd in part on other grounds*, 597 F.3d 436 (1st Cir. 2010). "At the pleading stage, a plaintiff need not demonstrate that they are likely to prevail, but a claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" *Corbett for Corbett v. Browning*, 717 F. Supp. 3d 158, 162 (D. Mass. 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Assessing whether a claim for relief is plausible is "context-specific," requiring "the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Insider trading violates Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.[2] Because insider trading claims sound in fraud, the Commission's complaint also must satisfy the requirements of Federal Rule of Civil Procedure 9(b). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud," however, "intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P.

[2] The elements of the Commission's insider trading claim are discussed in the Commission's opposition to Hatanian's motion to dismiss. (*See* ECF No. 93 at 4-5.)

9(b). In insider trading cases, Rule 9(b)'s particularity requirement is relaxed when specific facts are uniquely within a defendant's knowledge. *See, e.g., SEC v. One or More Unknown Traders in the Sec. of Onyx Pharm. Inc.*, 2014 WL 5026153, at *4 (S.D.N.Y. Sept. 29, 2014) ("because insider tips are typically passed in secret, it is often impractical to require plaintiffs to allege . . . details with particularity"); *SEC v. Roszak*, 495 F. Supp. 2d 875, 887 (N.D. Ill. 2007) ("direct evidence is rarely available in insider trading cases").

Section 10(b) claims require proof of scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Consistent with Rule 9(b), the Commission need not plead scienter with particularity and may meet its burden of pleading (and proving) scienter through circumstantial evidence. *Tambone*, 550 F.3d at 119 (SEC need only allege scienter generally); *SEC v. Druffner*, 517 F. Supp. 2d 502, 509 (D. Mass. 2007) ("scienter may be established by indirect evidence"); *see also SEC v. Scoppetoudo*, 2011 WL 294443, at *3 (S.D. Fla. Jan. 27, 2011) ("Suspicious timing of communications and trading may support an inference of bad faith and scienter.").

## II. The Commission's Proposed Second Amended Complaint Is Not Futile.

With deference given to the Commission's allegations and the proper standard applied, the Motion to Amend should be granted. Hatanian's arguments concern the strength of the Commission's case. For example, Hatanian invites the Court to test the strength of the Commission's factual allegations against evidence that he either supplies (Hatanian's parents' airline tickets, news about Amazon) or suggests is absent (*e.g.*, "about Hatanian's typical trading strategies"). Rule 12(b)(6) requires the Court to draw all reasonable inferences from the complaint in favor of the *Commission,* not *Hatanian,* and discern whether claims are sufficiently pled to put Hatanian on notice. They are.

To accept Hatanian's argument about futility, the Court would have to expand the scienter element to require the SEC to allege the precise information tipped to Hatanian, including a description of the duty owed and breached by the original tipper, and the tipper's compensation. That is not the law under *Dirks*, *Newman*, *Salman*, or any other relevant precedent in the context of insider trading. Rather, it is sufficient for liability that Hatanian knew, was reckless in not knowing, or consciously avoided knowing that he traded on the basis of information received through a breach of duty by someone else for some personal benefit. *See United States v. Newman*, 773 F. 3d 438, 449 & n.3 (2d. Cir. 2014) (tippee "does not need to know the details of the [tipper]'s disclosure of information," does "not have to know for certain how information was disclosed," "nor the identity of the insiders," so long as the tippee knew confidential information was divulged for personal benefit), *overruled on other grounds by Salman v. United States*, 580 U.S. 39 (2016); *SEC v. Obus*, 693 F.3d 276, 288-89 (2d Cir. 2012) ("[c]hain tippee liability may also result from conscious avoidance" or recklessness); *see also SEC v. Musella*, 678 F. Supp. 1060, 1063 (S.D.N.Y. 1988) (finding conscious avoidance where tippees "made a deliberate decision not to ask … about the confidential source[] … because they did not want to know").

Hatanian contends the SEC ignores relevant cases that establish more stringent pleading requirements, including *In Re Archegos 20A Litigation*, 156 F.4th 108 (2d Cir. 2025). (ECF No. 97, Opp. at 13-14.) *Archegos* is distinguishable for several reasons; most notably, there was no evidence Archegos was an insider or owed a duty to any of the relevant issuers, no evidence of a tip beyond suspicious trading volume, and no evidence of breach of duty. *Id*. at 116-119.[3] Here,

[3] *Archegos* involved claims subject to the Private Securities Litigation Reform Act ("PSLRA"). The heightened requirement to plead a "strong inference" of scienter, applicable in private securities fraud actions, is inapplicable in Commission actions. *See Tambone*, 550 F.3d at 119.

the complaint alleges that Hatanian traded while aware of and on the basis of material nonpublic information from an insider whom he knew or recklessly disregarded breached a duty to maintain the confidentiality of such information. (*See, e.g.,* ECF No. 94-1 at ¶ 128.) This, bolstered by the weight of the Commission's other allegations, is enough under *Newman*, *Salman*, and *Dirks*. *See*, *e.g.*, *SEC v. Watson*, 659 F. Supp. 3d 409, 418 (S.D.N.Y. 2023) (denying motion to dismiss where complaint alleged that the tippee knew the material nonpublic information came from an insider, thus tippee knew or should have known that information was conveyed in breach of fiduciary duty).

Hatanian also relies on *SEC v. Tambone*, 417 F. Supp. 2d 127 (D. Mass. 2006), to argue the Commission fails to meet Rule 9(b)'s requirement to plead with particularity the "who, what, or when" of its claim against Hatanian. (ECF No. 97, Opp. at 2, 4, 10.) But unlike *Tambone*, this is an insider trading case and not a fraudulent misrepresentation case. The Commission has adequately pled how and when material nonpublic information flowed through the tipping chain to Hatanian. The absence of more specific details about the precise substance of a given tip does not render the complaint inadequate under Rule 9(b). *See, e.g., SEC v. Wang*, 2016 WL 7671369, at *5 (S.D. Cal. Sept. 27, 2016) ("[Defendant] does not cite to any authority for the proposition that Rule 9(b) requires a plaintiff alleging a tippee claim provide a transcript of the language used to convey the tip, and the Court does not believe any such authority exists. Indeed, because insider tips are generally passed secretly, it would seem impractical to require the SEC to provide a verbatim transcript of such communication."); *Scoppetoudo*, 2011 WL 294443, at *4 (SEC's allegations sufficient to survive Rule 9(b) challenge even though "the SEC has not provided the precise words in the [tipping] communications").

**Conclusion**

In sum, for all the reasons above and those set forth in the Commission's initial memorandum, as well as its opposition to Hatanian's motion to dismiss, the Commission should be granted leave to file the proposed Second Amended Complaint, which is not futile and works no undue prejudice to Hatanian or any other defendant.

Dated: September 23, 2026 By: */s/ Rua M. Kelly*

Rua M. Kelly (Mass. Bar No. 643351)
Michael D. Foster (Ill. Bar No. 6257063)
U.S. Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
Kelly direct: (617)-573-8941
Email: kellyru@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 23, 2026, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notices in this case. I further certify that a copy of the foregoing will be served by e-mail or U.S. mail to any defendants not registered in the Court's CM/ECF system to receive electronic notices in this case.

*/s/ Rua M. Kelly*